UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TODD C. THIEL,

        Plaintiff,

PAUL GEHL,

        Intervenor-Plaintiff,

  v.                                    Case No. 12-C-530

WILLIAM WRIDE,

        Defendant.

**DECISION AND ORDER**

    Before me presently are motions for summary judgment filed by Intervening Plaintiff Paul Gehl and Defendant William Wride. For the reasons given herein, the motions will be granted in part and denied in part.

**I. Background**

    Plaintiff Todd Thiel and Defendant William Wride created Capital Partners FZ-LLC with the purpose of investing in a real estate development in Dubai. Paul Gehl, Thiel's father-in-law, invested $10 million in the company. Wride moved his family to Dubai to manage the business. In 2007 things went sideways, and Capital Partners and a Dubai entity called TECOM had a dispute that went to arbitration. Thiel, Wride and Gehl all met and signed an agreement governing how the proceeds of that arbitration would be distributed ("the 2007 Agreement"). Under that agreement, the three parties would share equally in any proceeds.

By 2008 Capital Partners was in liquidation, with Wride acting as liquidator. Capital Partners hired the law firm of Munsch Hardt to represent it in the arbitration, and the retention letter from that firm indicates its fees would be 30% of any gross recoveries, plus up to $200,000 in expenses. (ECF No. 92-7 at 4.) By 2010 they had reached a settlement with TECOM for $12 million. The same summer, Gehl, Wride and Munsch Hardt attorneys met at the Kansas City airport to determine how to distribute the proceeds. A handwritten, single-page document called "settlement agreement" was drafted at that meeting. The first line of the document reads:

> Division of 12 mm
> 4 to Gehl    4 to Munsch Hardt    4 to Wride

(ECF No. 85-4.)

The document was signed by Paul Gehl, Wride and Munsch Hardt lawyer Harr. Gehl and Thiel describe this document as the "4 / 4 / 4 Distribution agreement." According to Harr's deposition, the meeting was Gehl's effort to reach a solution because Thiel and Wride were not getting along. (ECF No. 85-10 at 128-29.) According to Harr, Thiel was not invited to the meeting because he "couldn't get along with anybody" and Gehl "recognized the stubbornness and difficulty that his son-in-law was creating in all this and he wanted to get past it." (*Id.* at 129-30.) Both Harr and Appenzeller, the other Munsch Hardt attorney present, viewed Gehl (who was about eighty at the time) as taking a "paternalistic" or grandfatherly approach, trying to bridge a divide between two feuding sons or grandsons.

Within weeks of the Kansas City meeting, a written settlement agreement was circulated. Thiel rejected it. Rather than a 4 / 4 / 4 split, he proposed a 3 / 3 / 3 / 3 split, the upshot of which is that he and Gehl would receive $6 million total, rather than $4 million. In discussing this with

2

his counsel, Wride's anger was apparent.

> Todd seems to think he holds the remote control when he doesn't. On June 21, 2010 Paul, Munsch and Wride agreed to $4 mm each. Todd can't handle the fact that he wasn't included in the negotiations . . . I think a call from Steve [Harr] to Paul [Gehl] is in order that states what will happen if the agreement we sent is not accepted by all parties next week.

(ECF No. 92-18 at MHKH_01394.)

Wride's lawyers agreed, and noted that they never expected Thiel would "roll over" and agree to everything that was discussed. (*Id.* at 01391.) Instead, it appears the parties all viewed it as incumbent on Gehl to try to get Thiel to agree to the terms the others had agreed to. "If Gehl can't live up to the best business solution he felt was possible, then there's no deal and there will be no further payout to Gehl, Todd or Jonathan. This is Gehl's problem, clearly he needs to be read a riot act . . ." (*Id.* at 01392.)

In August, Wride and Gehl held two meetings with Thiel, in Milwaukee and Appleton. Following those meetings, Thiel and Wride engaged in email discussions. On August 20, Wride sent Thiel an email asking to chat and "finish our conversation." (ECF No. 92-20.) The email describes Wride's efforts to commit to a schedule of payments to Capital Partners' creditors. On August 23, Thiel sent Wride a spreadsheet detailing all of the funds he believed Wride would be paying, including $365,000 Thiel had loaned the company, and indicating that "my personal investment [of $365,000] . . . would be a priority." (ECF No 92-21.) Rather than respond to the email, Wride decided, after consulting with counsel, to ignore the email. As he explained it in a deposition, "I'd already agreed in writing. Then I agreed on the 6th [of August]. I agreed on the 18th. I sent the email on the 20th. I funded it on the 22nd. I'm done. I already agreed and we were going to act on the agreement." (ECF No. 92-2 at 126.)

3

Indeed, Wride (and everyone else) began acting as though the settlement agreement was binding. In his capacity as liquidator, Wride began making regular payments to the Munsch Hardt law firm and to Gehl. When Thiel threatened legal action in 2012, Wride began deducting $30,000 from the payments to Gehl (to cover Thiel's potential attorney's fees), but the payments kept coming. In all, by January 2013 he had paid out some $3.7 million to Gehl and $3.95 million to Munsch Hardt.

In 2012, Thiel began this action seeking to collect the $365,000 he had loaned Capital Partners, which he alleges was the subject of an oral promise by Wride. Paul Gehl later intervened and now claims that the 4 / 4 / 4 agreement reached in 2010 is not binding and that the 2007 agreement should govern.

**II. Analysis**

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Here, the parties agree that the nature of any oral promise regarding the $365,000 Thiel claims he is owed is a factual matter outside the bounds of summary judgment. Instead, the parties focus on whether an agreement had been reached in 2010, and whether any promise was supported by consideration. Although the parties' interpretations of what happened in 2010 are certainly at odds, most of the underlying facts are undisputed.

**A. The 4 / 4 / 4 Distribution Agreement is Enforceable against Gehl**

Wride argues that there can be no genuine dispute that the document signed by Gehl at the Kansas City meeting evidenced an agreement to divide up the settlement proceeds on a 4 / 4 / 4 basis, with Gehl getting $4 million, Wride $4 million and Munsch Hardt $4 million. First, the

4

document itself reads "4 to Gehl   4 to Munsch Hardt   4 to Wride," and that statement is reflected in the very first line on the page. (ECF No. 85-4.) When Gehl signed such a document, the only reasonable inference is that he was agreeing to be bound by those terms.

In addition, Gehl later testified that "the amounts were agreed on" in Kansas City, or at least "presented" to him, and he "didn't have a damn thing to say." (ECF No. 85-8 at 74.) Wride also notes that the Munsch Hardt attorneys viewed the document as a final agreement for dispersing the settlement funds, at least with respect to Gehl. The goal was to "walk out" and all "be happy and smiling," having come to an agreement on the distribution. (ECF No. 85-10 at 140.) A later, more formal "lawyer's document" would come later, in an effort to get Thiel to sign. (*Id.*) But, according to Harr, the parties who were present believed they had come to an agreement, and there was even an "almost revelry . . . that we were all very happy that we had reached agreement to settle the matter." (*Id.*) Although Thiel had not been present, Gehl had committed to obtaining Thiel's agreement to the terms. (*Id.*)

According to Wride, the finality of the Kansas City document is also reflected in how Thiel himself described it in a later dispute with Wride. In his efforts to collect his $365,000 contribution from Wride, Thiel's attorney wrote a lengthy letter to Wride in January 2012, roughly a year and a half after the Kansas City meeting. In it, he tells Wride that in August 2010 Gehl, Thiel and Wride had all agreed to a "new distribution agreement" that was "premised upon a three-way split of the $12 million proceeds from the TECOM settlement: Paul [Gehl] and Todd [Thiel] in one group, you in another, and your litigation counsel . . . in the third group." (ECF No. 86-2.) In fact, the premise of the letter is that the 4 / 4 / 4 agreement governed the dispute. By January 2012, the dispute between Thiel and Wride was not whether they had come to a 4 / 4 / 4 agreement, but

5

whether Wride had agreed to pay the $365,000 out of his $4 million share, as Thiel contended.

Finally, Wride notes that Gehl and Thiel behaved all along as though they had accepted the premise of the 4 / 4 / 4 agreement. As noted above, Wride paid some $3.7 million to Gehl in installments for several years, with Gehl never objecting until he intervened in this action in 2013. By never objecting to the payments, this course of conduct suggests that Gehl treated the agreement as final and binding.

Gehl and Thiel dispute the above characterization. Gehl notes that his deposition testimony, taken in its full context, does not support the idea that he believed an agreement had been reached. When asked whether he had agreed to the 4 / 4 / 4 distribution, for example, he stated that "these are things we talked about. It isn't that we agreed on it." (ECF No. 85-8 at 53.) When asked why he had signed the document, he stated that "those are all points we talked about. . . I didn't walk away with a feeling that we did [agree to anything]." (*Id.*)

Similarly, the testimony from the Munsch Hardt lawyers indicates that they both understood that Thiel was not participating in the meeting and was not bound by any agreement reached there. (ECF No. 85-10 at 133.) Even if Gehl had agreed to the terms in Kansas City, he still had to obtain Thiel's agreement. And of course the Munsch Hardt lawyers had an interest in the settlement themselves—a four-million-dollar interest—so any testimony they might now provide must be viewed in that light.

Gehl and Thiel also point to Wride's own actions following the July meeting. On August 16, Wride sent an email to his lawyers from Munsch Hardt, indicating that "I am going to Wisconsin tomorrow for a few days to try and walk through the [agreement] and get it agreed to. If we can get the distribution with releases agreed to and a few other things we can get this thing

6

signed. I can deal with any outstanding issues with Todd if need be directly." (ECF No. 92-19.) If the parties had already reached a firm agreement, there would have been no point in Wride traveling to Wisconsin to try to "get it agreed to." And the subsequent email exchanges between Wride and Thiel, detailed above, indicate that Thiel was *not* in agreement. In fact, it was so tentative that the others were worried Thiel would "blow up" the tentative settlement the others had put in place.

To be enforceable, a contract needs to have agreement of the parties to be bound on all of the essential terms. Here, it is clear that such an agreement is lacking, at least with respect to Thiel and Wride. Although everyone, including Thiel' attorney, seemed to concede that the 4 / 4 / 4 structure governed the distribution, no one had ever agreed as to whether Thiel's claim for $365,000 was part of that structure or not. Accepting Thiel's view that the $365,000 would come out of Wride's share would mean that it was not really a 4 / 4 / 4 split but 4.365 / 4 / 3.635. The proceeds of the distribution are, of course, an essential term of the distribution agreement—*the* essential term—and there was never any indication that Gehl, Wride and Munsch Hardt had ever agreed with Thiel's view. The handwritten 4 / 4 / 4 meeting notes are silent on the matter. Thus, even if the parties had agreed in principle on a 4 / 4 / 4 split, such an agreement cannot bind Thiel if the parties had not agreed on whether significant amounts would be credited from one party to another.

Gehl cites these factors in suggesting that there was no meeting of the minds. But even if there was no agreement on the $365,000 between Wride and Thiel, that does not necessarily mean that the entire agreement is unenforceable against *anyone*. Since Thiel never signed the settlement agreement himself, his own side-dispute with Wride is immaterial to the outward manifestations

7

expressed by the parties who actually signed the contract. The fact remains that Gehl, Munsch Hardt and Wride all agreed on a 4 / 4 / 4 split, with no ambiguity in those terms. If Thiel, a *non*-signatory to the agreement, has a dispute with Wride, that side-dispute does not somehow relieve the signatories of their obligations under the agreement. In short, having signed the unambiguous document dividing the proceeds on a 4 / 4 / 4 basis, Gehl cannot rely on Thiel's private disagreement with Wride to suggest there was no meeting of the minds.

The question remains whether three signatories to an agreement can be bound by it when a fourth interested party has not signed it. The answer is yes. In *Consolidated Water Power Co. v. Nash,* the Wisconsin Supreme Court addressed a contract whose terms included a provision indicating that the contract was not enforceable unless all named parties signed it. 109 Wis. 490, 85 N.W. 485, 487 (1901). Citing *Nash,* the state court of appeals more recently concluded that because the contract at issue did *not* require the signature of all parties before it became enforceable, it could be enforced against those who did sign it. *Holzberger v. Holzberger,* 2005 WI App 193, 287 Wis.2d 133, 703 N.W.2d 384 (Wis. Ct. App. 2005). "In the absence of language in the document which 'by its very terms, provided that it should not be binding upon either or any of the parties thereto until signed and executed by a list of persons and corporations named,' . . . the settlement agreement binds only those parties who elected to participate in the settlement agreement . . . ." *Id.* The court concluded that "[i]t should be assumed that all the parties who sign the agreement are bound by it unless it affirmatively appears that they did not intend to be bound unless others also signed." *Id.* (citing *International Creative Mgmt., Inc. v. D & R Entm't Co.,* 670 N.E.2d 1305, 1310 (Ind. Ct. App. 1996)). *See also Angell v. Rowlands,* 85 Cal.App.3d 536, 542 (1978) ("in the absence of a showing that the contract is not intended to be complete until signed

8

by all parties, the parties who did sign will be bound."); *Skinner v. Haugseth,* 426 So. 2d 1127, 1131 (Fla. Dist. Ct. App. 1983) ("we hold that a contract not signed by all of the parties, but otherwise valid, may be upheld against a signing party, unless the nature or the wording of the contract indicates that his signature was conditioned upon all other parties signing the contract, or he can prove by parol evidence that when he signed the contract he made it known to the other parties who now seek to sustain the contract that he only intended to be bound if all parties signed it.") Here, the document itself contains no requirement that all parties must sign before any are bound. At best, the document and the parol evidence presented suggest that Gehl was going to try very hard to get Thiel to sign the agreement. But nothing in the record suggests that Gehl's *own* assent to the agreement was conditioned on Thiel's agreement.

It might be a different question if Thiel, rather than Gehl, were the party trying to escape liability under the 4 / 4 / 4 agreement. But no one is suing Thiel under that agreement, and so at present I am merely addressing Gehl's motion, which argues that *Gehl* is not bound by the 2010 settlement. Much of Gehl's motion is premised on the uncertainties and alleged incompleteness of the agreement owing to the fact that *Thiel* did not sign. But, having signed the agreement, Gehl cannot use Thiel's failure to sign the document as a basis to undermine a contract he agreed to himself.[1]

---

[1]Thiel does not appear to be seeking relief from the 4 / 4 / 4 agreement, either, except as an alternative argument. As suggested above, the existence of the 4 / 4 / 4 agreement is the premise underlying Thiel's claim for the $365,000 because Thiel asserts that the $365,000 was part of the 2010 settlement. In 2012 his own attorney wrote Wride, noting that the parties had come to a three-way agreement in August 2010. (ECF No. 86-2.) And his complaint indicates that he and Wride had "entered into an oral agreement, followed by written confirmation, for the distribution of settlement funds . . ." (ECF No. 1-1 at ¶ 22.)

9

Gehl's explanation for signing the document is not persuasive, either. He suggested he signed it merely because those were the points that were discussed at the meeting, but signing something is a clear manifestation of agreement, not merely acknowledgment. There is little purpose in signing something that merely reflects discussion topics unless one intends to be bound by them. Wride clearly understood this, as he soon began writing checks pursuant to the agreement. Munsch Hardt lawyers understood it as an agreement as well. And if Gehl did not understand that an agreement had been reached, he did an excellent job pretending like he did.

Finally, Gehl argues that the Kansas City agreement was merely an "agreement to agree," a preliminary draft that required a more formal instrument before it became effective. In many cases, such an agreement would be unenforceable. But in those cases, the reason such agreements are unenforceable is that they explicitly require formality and signatures as a term of the agreement itself.

Gehl relies on *Reprosystem, B.V. v. SCM Corp.,* 727 F.2d 257, 262 (2d Cir. 1984), where the court found any agreements, which had not been signed, to be preliminary and non-binding. There, however, the "initial purchase offer was made on the expressed condition that 'a formal agreement, which is satisfactory to SCM and [plaintiffs] be entered into.'" Thus, from the very initial offer, the parties contemplated that their agreement would not be complete until formal documents had been circulated and signed. "[T]he contract drafts, combined with the parties' other written communications, conclusively establish a mutual intent not to be bound prior to execution of the formal documents." *Id.* Here, by contrast, the Kansas City document was *signed,* and it contains no evidence that Gehl, Wride or Munsch Hardt were not intending to be bound until some other formal writing was executed.

10

It is likely that at least some of the parties expected to memorialize the agreement with a more formal written instrument in the future. Memorializing an agreement with a formal writing is a common practice, but there is a difference between merely memorializing a contract and stipulating that no contract will exist *until* it is memorialized in formal documents. If A and B have a handshake deal, and their lawyers later have them sign a contract, the written contract is merely evidence of a deal that had already been reached—it does not mean the contract was unenforceable until it was put in writing. As the court noted in *Reprosystem,* "the primary question on this appeal is one of intent. . . . Did the parties intend not to be bound prior to execution of a formal contract? Or, did they merely contemplate that their informal agreement would be reduced to a formal writing at some later time?" *Id.* at 261. Here, at most, some of the parties intended that their informal agreement would be reduced to a more formal writing, *not* that they were not bound by the agreement until such time.

The same court also noted the implausibility of having a preliminary agreement control the parties' rights, given the complexity of the transaction at hand.

> the result we reach is consistent with the realities of the complex transaction at issue. The proposed deal involved a $4 million sale of six companies which were incorporated under the laws of five different countries and which had assets of over $17 million, sales of $40 million, and profits of $4 million. Completing the transaction would require approvals of foreign governments, sales of both securities and assets, and the transfer of almost one thousand foreign employees, not to mention the myriad additional details attendant upon the sale of any business. Thus, the magnitude and complexity of the deal as reflected in the numerous written contract drafts not only reinforce the parties' stated intent not to be bound until written contracts were signed, but also reflect a practical business need to record all the parties' commitments in definitive documents.

*Id.*

In short, given how complicated the deal was, it was unrealistic to expect that the parties

11

could reach agreement absent formal, signed, written contracts would govern their arrangement. By contrast, in this case there was a $12 million pool of money that needed to be split up among a few parties. Although the underlying dispute in Dubai might well have been very complicated, dividing the proceeds from the money was not inherently so. It is thus not surprising that the parties were able to reach an agreement whose essence was reducible to a single-page handwritten document. Nothing more was required.

It is conceivable that, due to the brevity of the handwritten document, some of its terms might be difficult to enforce. But for present purposes, it is enough to say that in 2010, Gehl, Wride and Munsch Hardt agreed to divide the proceeds of the TECOM settlement in a 4 / 4 / 4 split, and that means Gehl cannot argue that any prior agreement should control.

**B. Gehl's Claims under UAE Law**

Gehl has also raised several arguments based on the central allegation that Wride did not properly live up to his role as a liquidator under the law of the United Arab Emirates. Gehl alleges that Wride was simply interested in enriching himself, rather than paying off Capital Partners' legitimate debts, which prominently include the debt to Gehl arising out of the 2007 distribution agreement.

But Gehl seems to concede that if the 4 / 4 / 4 agreement is enforceable, then he has no claim under UAE law because he agreed to accept $4 million out of the liquidation. That is, no one has disputed that creditors may agree to accept less than what they might otherwise be owed, and that is what occurred here. Since Gehl agreed to take $4 million, Gehl's claims that Wride has misappropriated funds or failed to follow other UAE liquidation procedures are moot.

12

**C. Thiel's $365,000 Claim**

The genesis of this lawsuit was Thiel's claim that Wride had promised to pay him $365,000 out of the settlement proceeds. Thiel claims this promise occurred orally at their August 18, 2010 meeting in Appleton. Following the meeting, on August 23, Thiel memorialized what he thought was their agreement in an email to Wride. That email indicated that "my personal investment [of $365,000] . . . would be a priority" and included a spreadsheet listing that debt as one of Wride's obligations. (ECF No 92-21.) Wride never responded to that email.

Wride denies that he promised to pay the $365,000 to Thiel, and both sides recognize that such an issue is not resolvable through summary judgment. Instead, Wride argues any such agreement would be unenforceable due to a lack of consideration. Wride's view is that the agreement had been an even 4 / 4 / 4 split, and thus to pay Thiel $365,000 on top of that would simply have been something in the nature of a gift because Thiel did not offer anything in exchange.

But in the context of an ongoing negotiation, consideration need not support every give and take between the parties. Wride was attempting to get Thiel's assent to the entire agreement, and thus he could have agreed to pay Thiel in order to settle Thiel's claim to the money, or simply to induce him to go along with all the other parties and achieve a global resolution of the settlement problem. Or, as Thiel suggests, it could have been compensation for Thiel agreeing to forego the 2007 distribution agreement. The point is, Thiel and Wride had an ongoing dispute, and therefore any agreement by one to pay the other would have been supported by consideration. The idea that such an agreement was tantamount to a "gift" is especially unpersuasive given the acrimony between the two at the time, as evidenced in Wride's emails. If an agreement did exist, it would

13

have been supported by consideration. Accordingly, summary judgment in favor of Wride would not be appropriate.

**D. The Release**

Finally, Wride argues that Gehl breached the release contained within the handwritten 4 / 4 / 4 agreement. Line 3 of that agreement reads "Mutual Full Complete Release including McKinley + Thiel." (ECF No. 85-4.) (McKinley Reserve was the name of a company Gehl controlled.) In disputing the viability of the release, Gehl relies largely on the argument that the Kansas City settlement was not a true agreement, an argument I rejected above. Gehl also asserts that the terms of the release are too vague to be enforceable and that it does not release Wride from any claims related to the 2007 settlement agreement.

Given the nature of the dispute, it is hard to find that the release is vague or somehow unclear. It is brief, no doubt. But the release uses the terms "full" and "complete" and "mutual," which any reasonable reader would understand as extremely broad in scope, and it also includes a reference to McKinley Reserve, Gehl's company. The evident purpose of such a clause was to ensure that the new settlement agreement was going to govern the disbursement of funds and that no one, including Gehl and his company, would make any claims based on any other agreements or promises. Thus, the existence of the release clause adds further support to the conclusion that the 4 / 4 / 4 agreement was comprehensive and binding, at least as to its signatories.

Even so, breach of a release does not mean that the other side is entitled to attorney's fees. Although such fees are in some sense "damages" flowing from the breach, courts do not routinely award fees unless the release clearly contemplates such an award. *Reigel v. Whelan,* No. 04-C-365, 2006 WL 51149, at *1 (E.D. Wis. Jan. 10, 2006). Accordingly, although the release provides even

14

Case 1:12-cv-00530-WCG   Filed 05/26/15   Page 14 of 16   Document 124

more evidentiary support for Wride's claim that Gehl had accepted a 4 / 4 / 4 split, it does not allow Wride to recover attorney's fees.

**E. Attorney's Fees for Wride as Liquidator**

Finally, Wride argues that, as liquidator, he is entitled to his attorney's fees for defending this action, which arises out of his liquidation of the company's assets. Under UAE law, as well as a resolution signed by Capital Partners' shareholders, Wride is entitled to expenses incurred in the course of his actions as a liquidator. Wride asserts that being sued is an action arising out of his liquidation duties.

Gehl argues that Wride is not entitled to use Gehl's money to fund his defense of Wride's own malfeasance regarding Capital Partners' funds. Of course, such an argument begs the question addressed above, which is whether Gehl had agreed, pursuant to the 2010 agreement, to accept $4 million in settlement. Since he did, he cannot suggest that Wride engaged in any malfeasance.

The question instead is whether Wride's legal expenses are expenses incurred in the course of his actions as a liquidator. Defending a lawsuit by Thiel, the other shareholder of Capital Partners, cannot rightly be considered an action taken as a liquidator. It is a dispute between two shareholders over proceeds to a settlement rather than a dispute about "liquidation" of the company to creditors. Thus, any fees resulting from Thiel's lawsuit are not recoverable.

It is less clear what to do with fees stemming from the complaint filed by Gehl. Gehl, of course, was not a shareholder and thus not party to the Capital Partners shareholder agreement, and so he cannot be bound by the clause allowing for liquidation expenses. If UAE law allows for liquidation expenses, however, it is conceivable that Wride could recover expenses caused by Gehl's intervenor complaint, which is a claim by someone in the nature of a creditor who alleges

15

the liquidation of company funds was improper. But the key question is, *from whom* may Wride recover litigation expenses? If a country's business law allows a liquidator to recover fees, the fees would presumably come from the company itself, not a third party like Gehl. Wride's own expert states that such expenses would come from "the company's funds." (ECF No. 85-15 at 10.)[2] Thus, although Wride might be entitled to receive compensation for attorney's fees, his claim would be against the company, not against Gehl. Wride has not supplied any authority for the proposition that he could unilaterally withhold money from an investor like Gehl, who was not a party to Capital Partners' agreements or governed by UAE liquidation law. Once Wride agreed to pay Gehl $4 million, he was obligated to pay it. If he has some sort of claim to be reimbursed for attorney's fees, it lies against Capital Partners, not Gehl.

**III. Conclusion**

In sum, Gehl's motion for summary judgment is **GRANTED** in part, in that I conclude that Wride is not entitled to withhold funds from Gehl. It is **DENIED** in all other respects. Wride's motion is **GRANTED** in part, based on my conclusion that Gehl and Wride are bound by the 2010 Kansas City agreement. The clerk will place the case on the calendar for a telephonic conference to address further scheduling.

**SO ORDERED** this 26th day of May, 2015.

/s William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court

---

[2] I am not deciding an issue of foreign law. Instead, I am merely noting that under any conceivable such law, reimbursement would come from the company itself rather than a third party.

16