UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

TODD C. THIEL,

        Plaintiff,

PAUL GEHL,

        Intervenor-Plaintiff,

  v.                                              Case No. 12-C-530

WILLIAM WRIDE,

        Defendant.

---

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

---

The parties appeared for a two-day bench trial arising out of a failed real estate investment in Dubai. The question presented was whether Plaintiff Todd Thiel and Defendant William Wride had reached a binding oral agreement that Wride would repay Thiel $365,000 out of the proceeds Wride controlled from a settlement stemming from an arbitration. Thiel claimed that the parties had reached an agreement during an August 2010 meeting in Appleton, while Wride denied this, arguing that he had merely promised to try to get their law firm to accept less money. For the reasons given below, I find by a preponderance of the evidence that Thiel's version of events is more credible and that a binding oral contract existed.

**I. Background**

Many of the background facts are set forth in this court's May 26, 2015 summary judgment decision. (ECF No. 124.) For present purposes, it is enough to state that in 2003 Todd Thiel and

William Wride created a partnership called Capital Partners with the goal of obtaining investment funds and developing a real estate project in Dubai. Wride testified that he was the "lead on the ground" manager of the partnership, working with locals in Dubai, including attorneys, bankers and government officials, in trying to secure a plot of land that could be profitably developed. (Tr. 177-79.) For his part, Thiel stayed in Wisconsin and was responsible for obtaining investors, in particular his father-in-law Paul Gehl, who eventually invested some $10 million in the company. Other funds came in, including loans Thiel himself made to the company totaling $365,000, which he funded out of the salary the partnership was to have paid him.

Eventually the partnership entered into an agreement with a Dubai government entity known as TECOM to develop a parcel of land, which the parties viewed as potentially being worth $100,000,000 upon completion. Unfortunately, during excavations in 2005 it was revealed that there were ancient antiquities on the site that prevented TECOM from conveying clear title to the land.

As a result of that setback, the partnership hired the Dallas-based law firm of Munsch Hardt Kopf & Harr, which agreed to represent the partnership, on a contingency basis, in its arbitration of the land dispute with TECOM. In 2007, Thiel, Wride and Gehl signed an agreement governing the distribution of the proceeds of any settlement, which they agreed would be distributed evenly to the parties. In 2010, without informing Thiel, Wride settled the dispute with TECOM for $12 million.

By then, the Munsch Hardt law firm had to be paid, and so it had become a party to the discussions about settlement proceeds. In June 2010, the Wride, Gehl and two Munsch Hardt lawyers met and signed a piece of paper indicating their agreement to what has been described as

2

a 4 / 4 / 4 split of the settlement funds, whereby the $12 million would be divided equally among Gehl, Wride, and the Munsch Hardt law firm. At the summary judgment stage, I concluded that those three parties had agreed to divide the proceeds based on the 4 / 4 / 4 understanding. What remained an open question was whether Wride had separately agreed with Thiel (who was not present at the settlement meeting) that Wride would pay Thiel $365,000 out of the $ 4 million that Wride received under that settlement agreement.

It is undisputed that Thiel and Wride met in Appleton, Wisconsin, on August 18, 2010 to discuss that dispute, among other things. Thiel testified that he was animated and did most of the talking, and ultimately Wride agreed to pay him the $365,000 that he had loaned the company several years earlier. The funds were to come out of the $4 million share Wride received from the $12 million settlement. (Tr. 64-65.) Thiel testified that he "made it crystal clear there are two priority payments: my 365[,000] and the personal loan that he had outstanding with McKinley Reserve," an investment vehicle he ran. (Tr. 66:17-18.) Those two things were "mandatory" and "in his bucket." (*Id.* at 21.) According to Thiel, Wride also agreed to provide a schedule that would govern all the payments that would be coming due to the various parties. This agreement, Thiel testified, was reached in exchange for Thiel "finally" coming on board with the concept of the 4 / 4 / 4 split that the other parties had agreed to in his absence. (Tr. 69:7.)

Wride's version is much different. He testified that he believed his obligation consisted of trying to get the Munsch Hardt lawyers to accept less than the $4 million they'd agreed to take, and that he would pay to Thiel any such discount. (The lawyers refused to take less than $4 million.) He states that he never agreed to pay Thiel out of his own funds, and protested that he had already agreed to the 4 / 4 / 4 settlement agreement with Gehl and the Munsch Hardt lawyers. As far as

3

he was concerned, he had no remaining obligation to Thiel.

Soon after their meeting, Thiel wrote an email to Wride outlining the terms of their agreement. The email describes Thiel's "personal investment" (i.e., the $365,000) as a priority that Wride would repay, after which Wride would have the responsibility for paying all of the other creditors and vendors. (ECF No. 92-21 at 2.) The same morning, Wride drafted an email response in which he indicated "As to the additional $365k I will try my best to help you, but I believe the split of the funds three ways is what was agreed to." (ECF No. 104-10 at 1.) In other words, only a few days after their in-person meeting, Wride took the position that he was not going to personally pay Thiel "the additional $365k" that Thiel was seeking. Before sending the email, however, Wride consulted with a Munsch Hardt lawyer. Ultimately, Wride never sent the email.

It was not until December 2010 that Wride made it clear that he did not believe he had any obligation to pay $365,000 to Thiel. A December 7 email indicates that "The amounts you state you personally put into CP [Capital Partners] I did not agree to pay. There is no way I could do this. We discussed your desire for this, but there was never an agreement." (ECF No. 104-12 at 3.) Thiel responded swiftly:

> During our meeting in Appleton . . . it was crystal clear that you were personally taking $4mm and that you were expecting to refrain from paying as many Capital Partners obligations as possible. As a result you agreed, at a minimum, to repay the amounts that I personally invested into the firm . . . Following that meeting, you were provided a clear, concise spreadsheet (e-mail attached) of the understanding AND of your obligations in order for this to move forward. There was no objection.

(ECF No. 104-12 at 2.)

Subsequent exchanges between the two echo this dispute, with Wride denying any agreement had been reached and Thiel insisting that it had. Eventually, this lawsuit followed.

4

**II. Analysis**

In deciding whether an oral contract exists, a court must determine whether there was a meeting of the minds between the parties with respect to the essential terms of the agreement and whether the parties intended to be bound by the oral agreement. *Witt v. Realist, Inc.,* 18 Wis.2d 282, 297, 118 N.W.2d 85, 93 (1962). In order for an oral contract to be binding and enforceable, the contract terms must be definite and certain. *Id.* In assessing the intent of the parties to be bound by an oral agreement, a court undertakes an objective analysis. Effect must be given to the parties' intent to contract "if such intent is discernible from their conduct or the contract language." *Herder Hallmark Consultants, Inc. v. Regnier Consulting Group, Inc.,* 2004 WI App 134, ¶ 8, 275 Wis.2d 349, 685 N.W.2d 564 (Wis. Ct. App. 2004); *Skycom Corp. v. Telstar Corp.,* 813 F.2d 810, 814 (7th Cir. 1987) (quotations omitted).

**1. The Parties' Actions and Words**

It is clear enough that Thiel himself believed there had been a meeting of the minds. After the August 18, 2010 meeting in Appleton, he acted as though the two had agreed, and he dropped the issue until he learned in December that Wride was now taking the position that there had been no agreement. The fact that Thiel dropped the issue after the meeting is telling, because he credibly testified that it would not have made commercial sense for him to simply walk away with nothing when his partner stood to realize $4 million. In addition, Thiel had at least a colorable claim, based on the 2007 agreement, to much more money. In short, there would have been no reason for Thiel to simply drop the issue unless he firmly believed that he and Wride had come to an agreement regarding the $365,000.

Months later, when Thiel learned that Wride was now denying any agreement, the emails

5

from Thiel became laced with bitterness and outrage. Thiel writes, "It seems the only question is why you are now refusing to pay my personal investment in Capital Partners . . . We all agreed on that and it was done. . . . Please don't do this. We agreed and it is done." (ECF No. 92-23 at 11.) He also wrote, "you are reneging on our understanding as set forth at our meeting in Appleton, WI on August 18, 2010 that was followed by an e-mail and a clearly defined spreadsheet of obligations." (*Id.* at 10.) "This attempt to renege on your commitment is nothing more than duplicity on your part." (*Id.* at 4.) These contemporaneous emails, along with Thiel's credible testimony, convince me beyond any doubt that Thiel himself clearly believed that Wride had agreed to pay the $365,000 out of Wride's proceeds from the TECOM settlement.

The question, then, is whether Thiel's belief that an agreement had been reached was based on objective manifestations of assent made by Wride, or whether it was a purely subjective conclusion on Thiel's part. I conclude that the preponderance of the evidence demonstrates that an agreement had, in fact, been reached.

I begin with what has already been stated, which is the fact that Thiel *behaved* as though he and Wride had agreed. Although a single party's subjective belief is not controlling, of course, it is nevertheless relevant evidence of what actually occurred. To put it concretely, one party's firm belief that an agreement was reached makes it more likely that an agreement *was* reached. Here, that subjective evidence is bolstered by the fact that Thiel's demands were not some kind of off-handed or vague request; instead, what Thiel repeatedly called "the 365" or "my 365" was something he had been explicitly demanding for some time, not just orally but in writing. The fact that he ceased those requests when he did is strongly suggestive that Wride had convinced him that his demand for the $365,000 would be met. And because he was already suspicious of Wride's

6

handling of the TECOM settlement, it would have been even more unlikely for Thiel to back down unless Wride had made his assent clear. Finally, Thiel was experienced enough in the business world to know when an agreement had been reached, and from his testimony it was apparent that Wride had convinced Thiel that he was assenting to his demand for the $365,000. Based on his testimony and the clarity of his demand, I do not believe Thiel would have been satisfied with some kind of vague brush-off from Wride. He would have demanded a clear expression of agreement, and that is what he received.

This is confirmed by the December 2010 emails, in which Thiel lambastes Wride for reneging on their agreement, a sentiment Thiel reprised in court with significant genuineness. In both his contemporaneous emails and his more recent testimony, Thiel expressed outrage when Wride refused to live up to his end of the deal, an emotional response that was both plausible and credible. Thiel's response lacked any suggestion that it was manufactured, or part of some kind of ruse to pretend an agreement had been reached when it had not. Instead, it represented the normal reaction of someone who believed the other party had come to an agreement and was now going back on his word.

Finally, there is the matter of the email Wride drafted but never sent. He testified that he did not send the email because he wanted "to let sleeping dogs lie." (Tr. 161:17.) But the payment of $365,000 was hardly a sleeping dog: it had been a contentious point—*the* point of dispute, in fact—and the purpose of Thiel's own email was to obtain Wride's written confirmation as to what they'd orally agreed to. It simply did not make sense to avoid sending the response email unless Wride had some other purpose, such as to remain silent and let Thiel *think* they'd reached an agreement. Moreover, there is no indication that Wride ever had a "let sleeping dogs lie" kind of

7

attitude about this issue, or *any* issue. The record is replete with the back-and-forth emails Wride and Thiel exchanged, even while on vacation. If Wride believed an agreement had *not* been reached, the sensible thing would have been to respond right away and make that clear rather than drafting an email and never sending it. Ultimately, Wride's explanation for the unsent email was unpersuasive.

In sum, I conclude that the fact that Thiel acted as though an agreement had been reached is strong evidence that an agreement *had* been reached. Wride's own *non*-response to Thiel's August 23 email was also suggestive of an agreement. And Thiel's expressions of injury at the time, and during the trial, were credible indicia not only that Thiel *believed* an agreement had been reached, but that Thiel's belief was based on a firm commitment made by Wride himself.

**2. The General Economic Circumstances Also Suggest Agreement**

In addition to the testimony and other evidence, the general economic circumstances of the relationship make it reasonable to believe that Thiel would have been paid some significant amount of money out of the $12 million settlement. In short, given the parties' equal partnership, Wride had to offer a plausible reason why he would be entitled to receive $4 million (minus the payouts to creditors he would make) and Thiel would get nothing. Wride did not do so.

Wride argues it is undisputed that he played a much more active role in the day-to-day aspects of Capital Partners, and from that premise he suggests it made perfect sense for Thiel to receive nothing out of the settlement. Although clearly Wride "did" more in establishing the investment project, that does not explain why one partner would expect to receive $4 million while the other received nothing. This is particularly so since it appears Wride's main contribution to the company was the selection of a parcel of land that ultimately proved to be the downfall of the

8

enterprise. Moreover, their roles were designed to be different. From the entirety of the testimony, it appears Wride's role was to establish a foothold in Dubai and get the project going, while Thiel's job was to obtain investments here in the United States, most particularly from his father-in-law, Paul Gehl. Obtaining funding for a risky international investment is not an easy sell, and thus raising capital can be just as crucial to a fledgling venture as the work of an "on the ground" project manager. The fact remains that both were equal partners, and the fact that Wride was on-site in Dubai for a number of years does not mean that it made economic sense that he should receive $4 million for his efforts when his partner received nothing, and in fact lost his original loan.

The economics of the settlement dynamics also point to an agreement to pay Thiel. Previously, in 2007, the parties had negotiated a distribution agreement, which, if enforceable, would have entitled Thiel to $3 million—nearly ten times what he was now claiming. Thiel thus testified that he was making a huge concession by seeking only the $365,000 he had lent the company. Regardless of whether the 2007 agreement remained enforceable or not, at a minimum it gave Thiel a colorable entitlement to much more than $365,000, and Wride knew that. So, with the 2007 agreement looming in the background, Thiel possessed the leverage to demand a significant payout if he agreed to go along with the newer 4 / 4 / 4 arrangement, which he'd been left out of. Wride clearly wanted Thiel's assent to the new arrangement, and the other parties were all in agreement that it was paramount to obtain Thiel's agreement to the concept of 4 / 4 / 4 distribution. Given those circumstances, it is not surprising that Wride would have acceded to the payment of $365,000 if it meant Thiel would abandon any claim to more money. By contrast, as discussed above, it would not have made sense either for Thiel to agree to take nothing, or for Wride to believe Thiel would agree to take nothing.

9

Finally, the economic reality that existed in 2010 was that Wride had control of the $12 million in settlement funds and Thiel did not. Wride knew as of August that Thiel believed they had reached an agreement, but instead of contesting that right away he remained silent, not sending the email he drafted in response to Thiel's. In a September email to Steve Harr, for example, he explains that Thiel wanted to get paid, and he admitted in his testimony that he knew Thiel believed they had reached a deal on the $365,000. (Tr. 165.) The normal course for someone who believed a mistake had been made would be to correct it, not let the other party continue to believe something that was false. Instead, Wride spent several months allowing Thiel to believe there was an agreement. This suggests that Wride *had* made some kind of affirmative signal indicating that he'd agreed to Thiel's demand. Because he was in control of the money and the payout schedule, he apparently hoped that making payments under the schedule he adopted himself would result in a *fait accompli* that Thiel would be unable to challenge when the funds dried up.

**3. The $365,000 was a Loan**

A final factor is that the $365,000 Thiel sought was repayment for loans he'd made the company years earlier. The loans were made in the form of unrealized salary. It was undisputed that $365,000 represented the amount of loans Thiel had made to Capital Partners in 2003 and 2004, when the company was in the process of finding property to develop. Capital Partners carried those loans as debt on its books, suggesting that Thiel's investment was indeed a loan rather than an equity investment. (Tr. 14:8-9.)[1] Not surprisingly, Thiel wanted the loans repaid as a condition of any winding up settlement. Wride was in the process of paying other creditors, and never offered a sound explanation for why he would be acting as a liquidator, settling up all the

---

[1] The trial transcript is found at ECF Nos. 149 and 150.

10

company's debt, but would leave out the debt owed to Thiel. Moreover, Wride himself had not made such a loan to the company, and so it made even less sense that he would stand to gain $4 million (minus payouts) while his equal partner got nothing from the settlement. Finally, the fact that the loans were based on *salary* Thiel did not take is a strong suggestion that the partnership would eventually reimburse him, as with any kind of deferred compensation.

**III. Conclusion**

The evidence conclusively points to an agreement between Thiel and Wride. The economic circumstances of the relationship strongly suggested that the deal Thiel alleged occurred would have been reasonable and even expected. The parties acted as though a deal had been reached, and Thiel's testimony that Wride had agreed to such a deal was credible. Accordingly, I conclude that the oral agreement alleged by Thiel existed. Thiel will be entitled to judgment on his contract claim.

The clerk will set the case on the calendar for a telephonic scheduling conference to discuss remaining claims.

**SO ORDERED** this 4th day of January, 2016.

/s William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court